1

2                                                MAR 3 1 2004

3                                        CLERK, U.S. DISTRICT COURT
                                         EASTERN DISTRICT OF CALIFORN
4                                        BY_____
                                                   DEPUTY CLERK
5

6

7              IN THE UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

TALITHA FALKENBURG, et al.,

10
        Plaintiffs,                    CIV.S-01-1478 DFL GGH
11

12      v.                             MEMORANDUM OF OPINION
                                              AND ORDER
13
COUNTY OF YOLO, et al.,
14
        Defendants.
15  _____/

16      This case arises out of the August 5, 2000 suicide of

17  Stephen Achen ("Achen"), a pre-trial detainee in the Yolo County

18  Monroe Detention Facility ("MDF").  Plaintiffs are the deceased's

19  relatives and his estate.[1]  Defendants are the County, the

20  California Forensic Medical Group ("CFMG"),[2] MDF guards, and CFMG

21

22                            259

23  _____

24      [1] Plaintiffs are Talitha Falkenburg (Achen's estranged
    wife), Norman Achen (Achen's father), Barbara Eaton-Achen
25  (Achen's mother), Jane Deming (Achen's sister), and Barbara
    Gabriel (Achen's sister).
26
        [2] CFMG provides health care services to inmates at the
    County's jail facilities.

employees.[3]  There are nine claims:

    **Claim 1:** Violation of the Fourteenth and Eighth Amendments for inadequate medical care.[4]

    **Claim 2:** Inadequate training, screening, and supervision of medical and correctional staff.[5]

    **Claim 3:** Deliberate indifference to the poor medical care at MDF.[6]

    **Claim 4:** Violation of Article I, § 7(a) of the California Constitution.

    **Claim 5:** Violation of Cal. Civil Code § 52.1(b).

    **Claim 6:** Negligent wrongful death.

    **Claim 7:** Intentional wrongful death.

    **Claim 8:** Negligent Infliction of Emotional Distress on plaintiff Deming.

    **Claim 9:** Intentional Infliction of Emotional Distress on Achen.[7]

<u>I.   The Summary Judgment Motions</u>

    Summary judgment motions have been made by the "County

---

    [3]   The individual defendants are County Sheriff E.G. Prieto; Correctional Officers Fred Miller and Ron Sykosky; CFMG Medical Director Asa Hambly; CFMG Nurses Jan Christison, Melinda Peterson, Kathleen Sindelar, and Kyle Snow; and CFMG Program Manager Rick Howell.

    [4]   This claim further asserts that defendants' actions resulted in loss of consortium and amounted to pre-conviction punishment.  (Compl. ¶¶ 75-77.)

    [5]   Prieto, Miller and Howell are the named individual supervisors.  They are sued in their individual capacities.

    [6]   Prieto, Howell and Hambly are sued in their official capacities.  CFMG and the County are also named as defendants.

    [7]   This claim is brought by Achen's estate only.

defendants," the "CFMG defendants" and Asa Hambly.[8]  The County defendants move for summary judgment on plaintiffs' first five causes of action.[9]  (County Defs.' Mot. at 2.)  Hambly filed three motions.  He moves for summary judgment on plaintiffs' negligence/wrongful death, negligent infliction of emotional distress, intentional infliction of emotional distress and § 1983 claims against him.  (Hambly Mot. I at 7-8.)  He also moves to restrict pain and suffering damages for all nine claims brought by Achen's estate.  (Hambly Mot. II at 5.)  Finally, Hambly seeks summary judgment on Deming's negligent infliction of emotional distress claim.  (Hambly Mot. III at 3.)

Defendants have not filed these four motions together. Instead, they have submitted seven joinder requests.[10]  These requests are denied.  Each defendant's alleged contribution to Achen's suicide is highly variable and fact-specific.  Only defendants who have filed summary judgment motions are considered moving parties.[11]

---

[8]  The "County defendants" are Yolo County, Prieto, Miller and Sykosky.  The "CFMG defendants" are CFMG, Christison, Howell, Sindelar, Snow and Peterson.

[9]  Instead of moving for summary judgment on the remaining four state law claims, the County defendants asked the court to decline supplemental jurisdiction over them.  Alternatively, the County defendants join defendant Hambly's motions for summary judgment on the state law claims.  (County Defs.' Mot. at 2.)

[10]  The CFMG defendants request joinder to all three of Hambly's summary judgment motions.  Hambly requests joinder to the County defendants' motion, and the County defendants request joinder to all of Hambly's summary judgment motions.

[11]  Although the CFMG defendants have not submitted any motions for summary judgment, they have submitted both a reply in support of Hambly's second motion for summary judgment and a

## II.  Statement of Facts

Achen was arrested by the Davis Police Department on July 26, 2000 and charged under Cal. Penal Code § 273.5 for corporal injury to a cohabitant, his girlfriend Laura Hamilton.  (Pls.' SDF & SUF ¶ 20.)  He was transported to MDF and booked as a pre-trial detainee.  (Pls.' Opp'n at 1.)  CFMG staff conducted the medical intake screening during Achen's booking.[12]  (Pls.' SDF & SUF ¶ 66.)  During the screening, Achen told Licensed Vocational Nurse ("LVN") Melinda Peterson that he had attempted suicide two weeks earlier, and that he had prescriptions for Risperdal and Zoloft, two psychotropic medications.  (County Defs.' Mot. at 5; Johnson Decl., Ex. 46.)  Peterson placed Achen on Suicide Watch I after noticing two superficial wounds on his wrists.  (Pls.' SDF & SUF ¶¶ 21, 23.)

"Suicide Watch I" requires that an inmate be: (1) placed under open supervision; (2) denied access to razors, sharp objects or other items commonly used to attempt suicide (including plastic bags, shoe laces and sheets); and (3) monitored by correctional staff every fifteen minutes and by health services staff every six hours.  Furthermore, all officer monitoring must be documented on a watch log, and health services

_____

request to join it.

[12]  All decisions concerning the mental or physical health of inmates, including the observation and querying of all new inmates for history or signs of mental illness, are made by CFMG staff.  (County Defs.' Mot. at 3.)  See California Administrative Code, Title 15 § 1200 ("In Type I, II, III and IV facilities . . . [m]edical, dental, and mental health matters involving clinical judgments are the sole province of the responsible physician, dentist, and psychiatrist or psychologist respectively.").

documentation must be placed in the inmate's health record.
(Pls.' SUF ¶¶ 72-74; Johnson Decl., Ex. H at 264.)  "Suicide
Watch II" includes all elements of Suicide Watch I, plus
placement of the inmate in a holding cell.  (<u>Id.</u>)  These are the
only two levels of formal suicide watch at MDF.

The next day, July 27, 2000, Psychiatric Nurse Kathleen
Sindelar evaluated Achen.  (<u>Id.</u> ¶ 24.)  During the evaluation,
Achen agreed not to harm himself.  (<u>Id.</u>)  Sindelar discontinued
the formal suicide watch and placed an order to verify Achen's
medications with Achen's psychiatrist in San Francisco.[13]  (<u>Id.</u> ¶
25.)  Achen was then permitted to enter the general prison
population.  (<u>Id.</u>)

On July 28, 2000, Laura Hamilton, Achen's girlfriend,
telephoned the Davis Police Department to report that Achen had
called her and threatened to kill himself if she did not drop the
charges against him.[14]  (<u>Id.</u> ¶ 27.)  That same day, Hambly
reviewed Achen's medical file.  (Hambly Mot. I at 3.)  Concluding
that Achen's care was adequate, Hambly did not visit Achen or
order the medical staff to provide additional care.  (<u>Id.</u>)

On July 30, Achen filled out two Inmate Health Services
Requests (or "pink slips") for prescription medication.  (<u>Id.</u> ¶
28.)  On the first slip, Achen reported, "[I have] severe attacks
from neglect of psychotropic drugs and anti-anxiety medication.

---

[13]  Plaintiffs dispute when MDF staff eventually placed the
call to the psychiatrist.

[14]  The Davis Police Department did not inform MDF of
Hamilton's call until August 3, 2000.  (County Defs.' SUF ¶ 54.)

Seven days off and feeling in danger." The second form stated, "[I have] severe attacks from neglect of psychotropic drugs and anti-anxiety medication. Seven days off prescribed drugs and I'm feeling mentally sick." (Johnson Decl., Ex. 13.) The slips were given to CFMG staff. (Id.)

Also on July 30, Sergeant Tina Day was working as a rover at MDF. (Id. ¶ 29.) Achen told Day that he might become self-destructive if he did not get his medications. (Id.) During the next hour, Day noticed that Achen acted increasingly concerned; he started to perspire and had a nervous demeanor. (Id. ¶ 30.) Day contacted Nurse Sindelar and asked her to speak with Achen that day. (Id. ¶ 31.) Sindelar told Day about her previous interaction with Achen and described the agreement Achen had made not to hurt himself. (Id. ¶ 32.) Day then told Sindelar that she felt it was important for Sindelar to visit Achen.[15] (Id. ¶ 33.) Later that day, at approximately 8:17 p.m., Sindelar evaluated Achen. (Id. ¶ 34.) Sindelar's notes state that Achen told her that he was anxious, had talked about suicide earlier that day, and had not taken his prescription medications for approximately one week. (Smith Decl., Ex. J, at 72, 000014.) Sindelar reminded Achen of the agreement he had made promising not to harm himself. (Pls.' SDF & SUF ¶ 34.) Achen responded that he had no intention of harming himself. (Id. ¶ 39.) Sindelar did not place Achen on formal suicide watch, but she

---

[15] Day did not log her encounters with Achen and Sindelar until after Achen's death; she then wrote a memo at the request of one of the lieutenants. (Pls.' Opp'n at 2.)

scheduled a follow-up visit with Achen for August 8, 2000. (Smith Decl., Ex. J, at 70.)

On July 31, 2000, Achen's sister, Barbara Gabriel, called MDF. She spoke to medical staff about Achen's prescriptions and gave the name of Achen's psychiatrist. (Pls.' SDF & SUF ¶ 40.) Gabriel telephoned MDF again on August 1, 2000 and spoke with Correctional Officer Fred Miller. (Id. ¶ 42.) The parties dispute what Gabriel told Miller. Defendants assert that Gabriel told Miller that she was afraid that Achen "might harm himself." (Id. ¶ 42; County Defs.' Mot. at 6.) Plaintiffs assert that Gabriel told Miller that she thought her brother "might kill himself." (Pls.' SDF & SUF ¶ 42.) Miller told Gabriel, "we'll take care of it." (Id.) Miller then contacted Nurse Peterson and asked that she evaluate Achen. (Smith Decl., Ex. 1, at 15.) Peterson evaluated Achen that day. (Id.) Afterwards, she told Miller that Achen's main concern was getting his medications, that Achen did not want to harm himself, and that he did not need to be placed on suicide watch. (Smith Decl., Ex. O, at 27.) After his conversation with Peterson, Miller asked two officers to keep an "informal watch" on Achen by checking on him every fifteen minutes.[16] (Id.) These officers kept informal watch on Achen and kept a welfare check log of their observations. (Id.)

On August 1, 2000, Achen's psychiatrist verified Achen's medications with CFMG. (Pls.' SDF & SUF ¶ 50; Johnson Decl., Ex.

---

[16] Miller did not put in the shift log that Gabriel had called, nor did he record his interactions with Peterson or the two officers. (Pls.' Opp'n at 12.)

14 at 000138.)   MDF began dispensing the medications the

following day.   (Johnson Decl., Ex. 34.)   Also on August 1, Nurse

Peterson placed a "sticky note" on Achen's medical file

requesting that a medical doctor visit Achen.[17]   (Id., Ex. 5, at

15.)

On August 3, 2000, Sergeant Eleanor Schneider ("Schneider")

accommodated Achen's request to be moved into a cell with another

inmate.   (Pls.' SDF & SUF ¶ 51.)   Also on August 3, 2000, Nurse

Sindelar reviewed Achen's pink slips.   She wrote on the slips

that she had seen Achen on July 30, 2000.   (Smith Decl., Ex. J,

at 69.)   The Davis Police Department called MDF on August 3,

2000, and spoke with a records officer about the police report

concerning Hamilton's phone call.   (Id., Ex. L, at 57.)   The

records clerk then contacted Sergeant Schneider.   Schneider

contacted Nurse Christison and asked that she interview and

evaluate Achen.[18]   (Id.)   Christison visited Achen and reported

to Schneider that Achen was not suicidal and that he had been

placed on the Registered Nurse Psychiatric Call List for

evaluation.[19]   (County Defs.' Mot. at 7.)

At approximately 1:00 p.m. on August 5, 2000, Achen's

_____

[17]   Whether this note remained on Achen's file and whether
Hambly reviewed the file a second time after July 28, 2000 are
unclear.   (Pls.' Opp'n to Hambly Mot. I at 13; Johnson Decl., Ex.
10, at 31.)

[18]   Schneider did not tell Christison that Achen had
recently been placed on informal suicide watch.   (County Defs.'
SUF ¶ 57.)

[19]   Plaintiffs dispute, and it is unclear from the record,
whether Achen was placed on the psychiatric call list.   (Pls.'
SDF & SUF ¶ 55.)

sister, Jane Deming, arrived at MDF with her husband for a visit
with Achen.[20]  (Deming Opp'n at 1.)  At approximately 1:30 p.m.,
Achen notified Officer Johnson that he wanted to see a nurse.
(Pls.' SDF & SUF ¶ 56.)  Johnson asked Nurse Kyle Snow to speak
with Achen.  (Id.)  Snow took Achen to a medical room.  (Id.)
Johnson stood outside the door and heard Achen request an
increase in his medication.  (Id. ¶ 57.)  He also heard Achen
explain that he had anxiety about the upcoming visit with his
sister.  (Id. ¶ 58.)

At approximately 2:30 p.m., Correctional Officer Sykosky was
informed that Deming had arrived for her visit with Achen.  (Id.
¶ 59.)  While attempting to contact Achen on the intercom to
inform him of Deming's arrival, Sykosky heard an inmate say that
Achen was going to kill himself.  (Id.)  Sykosky went to Achen's
cell and found Achen against the north wall of the cell, facing
east in a prone position.  (Id. ¶ 60).  Achen had hung himself
from his bunk.  (Id.)  Sykosky called for medical assistance and
tried unsuccessfully to resuscitate Achen.  (Id. ¶¶ 61-62.)
Achen was pronounced dead at approximately 3:26 p.m.  (Id. ¶ 64.)

During this time, Deming and her husband were in the lobby
to the MDF.  (Deming Opp'n at 1.)  At some point, a staff member
announced that something had happened inside and that guests
could stay to see if visitations would continue.  (Id.)  Deming
waited.  (Id.)  At approximately 3:40 p.m., jail staff announced
that visitation had been canceled.  (Id.)  While leaving MDF,

---

[20]  The visit was scheduled for 2:00 p.m.

Deming and her husband noticed ambulances near the loading dock of the jail.  (Id.)  Deming told her husband that she "knew" that the ambulances were there for her brother.  (Id.)  Deming returned later that day to see her brother.  (Id.)  At this time, she learned that her brother had committed suicide.  (Id.)

### III.  Federal Claims - 42 U.S.C. § 1983[21]

### A.  Deprivation of a Constitutional Right

Plaintiffs allege that defendants failed to provide Achen with adequate medical care, in violation of the Fourteenth and Eighth Amendments.[22]  Because Achen had not been convicted of a crime, "his rights derive from the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment's protection against cruel and unusual punishment." Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002) (citing Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861 (1979)).  The parties dispute the scope of protections afforded to Achen under the Fourteenth Amendment.  Defendants argue that any alleged violation must be measured by the deliberate indifference standard.  (County Defs.' Mot. at 10.)  Plaintiffs argue that deliberate indifference is a minimum requirement, and that the standard is more akin to gross negligence or reckless indifference.  (Pls.' Opp'n at 6.)  In Daniels v. Williams, 474 U.S. 327, 334 n.3, 106 S.Ct. 662, 667 n.3 (1986), the Supreme

_____

[21] Plaintiffs Deming and Gabriel stipulated to the dismissal of their § 1983 claims.  (Order 11/14/2002.)

[22] There is no dispute that the defendants acted under color of state law.

10

Court reserved the question of "whether something less than
intentional conduct, such as recklessness or gross negligence is
enough to trigger the protections of the Due Process Clause" for
pre-trial detainees.  Furthermore, the Ninth Circuit has not
directly answered this question.  However, in a recent ruling on
the scope of protections afforded to pre-trial detainees under
the Fourteenth Amendment, the court stated:

> To apply the deliberate indifference standard here
> would be to relegate [pre-trial] incapacitated criminal
> defendants to the same level of treatment afforded to
> convicted prisoners, a result that <u>Youngberg</u> rejected
> . . .[O]ur point here is to emphasize that substantive
> due process rights [for pre-trial detainees] may demand
> more than a lack of deliberate indifference.  <u>Or.</u>
> <u>Advocacy Ctr. v. Mink</u>, 322 F.3d 1101, 1120 (9th Cir.
> 2003) (citing <u>Youngberg v. Romeo</u>, 457 U.S. 307, 325,
> 102 S.Ct. 2452, 2463 (1982)).

While this passage is consistent with other Ninth Circuit
discussions,[23] how far the Ninth Circuit would expand the
contours of this right remains unclear.

Other circuits have applied the deliberate indifference
standard to Fourteenth Amendment claims by pre-trial detainees.
<u>Natale v. Camden County Corr. Facility</u>, 318 F.3d 575, 581 (3d
Cir. 2003) ("In previous cases, we have found no reason to apply
a different standard than [deliberate indifference] when
evaluating whether a claim for inadequate medical care by a

---

[23]   <u>See also</u>, <u>Lolli v. County of Orange</u>, 351 F.3d 410, 419
n.6 (9th Cir. 2003) (declining to "pursue the issue" of whether
pre-trial detainees are afforded a more demanding standard of
care than deliberate indifference because the plaintiffs had not
made the argument for it); <u>Gibson</u>, 290 F.3d at 1187 n.9 ("It is
quite possible . . . that the protections provided pretrial
detainees by the Fourteenth Amendment in some instances exceed
those provided convicted prisoners by the Eighth Amendment.").

1  pre-trial detainee is sufficient under the Fourteenth

2  Amendment."); <u>Collignon v. Milwaukee County</u>, 163 F.3d 982, 989

3  (7th Cir. 1998) ("In the context of a claim for inadequate

4  medical care [by pre-trial detainees], the professional judgment

5  standard requires essentially the same analysis as the Eighth

6  Amendment standard.")  Without more guidance from the Ninth

7  Circuit on this question, and in light of the case law from other

8  circuits, the deliberate indifference standard will be applied

9  here.

10      Under the deliberate indifference standard, "[a] defendant

11  is liable for denying needed medical care only if he knows of and

12  disregards an excessive risk to inmate health and safety."

13  <u>Gibson</u>, 290 F.3d at 1187.

14      i.  Officers Miller and Sykosky

15      While Miller was likely aware of Achen's serious medical

16  needs after Gabriel's call on August 1, there is not enough

17  evidence in the record to show that he acted with deliberate

18  indifference to Achen's condition.  It is undisputed that after

19  Gabriel's call, Miller promptly contacted Nurse Peterson, who

20  evaluated Achen later that day.  (Pls.' SDF & SUF ¶ 44-45.)

21  Peterson then reported to Miller that Achen did not want to harm

22  himself and did not need to be placed on suicide watch.  (<u>Id.</u> ¶

23  45.)  Even after Peterson's diagnosis, Miller still asked two

24  officers to keep an "informal watch" on Achen and check on him

25  every fifteen minutes.[24]  Miller's actions did not amount to

26  _____

    [24]  Furthermore, failing to log Gabriel's call in the shift
    log did not amount to deliberate indifference, given that Miller

1  deliberate indifference.

2      Similarly, the evidence does not support a finding that
3  Sykosky's actions were deliberately indifferent.  Plaintiffs
4  argue that Sykosky knew that Achen needed more vigilant
5  supervision, and that his failure to place Achen on formal
6  suicide watch constitutes deliberate indifference.  Plaintiffs
7  argue that Sykosky knew that Achen had been placed on formal
8  suicide watch during intake, struggled with his incarceration,
9  had been placed on informal watch at various times during his
10  incarceration, and showed a heightened level of anxiousness on
11  August 5, 2000.  (Pls.' Opp'n at 28.)  Plaintiffs contend that
12  Sykosky's knowledge of these circumstances and his subsequent
13  failure to place Achen on suicide watch constitutes deliberate
14  indifference.  (Id.)  However, that Sykosky knew of Achen's
15  suicide risk upon intake or afterwards is not enough to show
16  deliberate indifference; throughout the ten days after his
17  admission, Achen received different levels of medical supervision
18  based on various assessments of his needs.  Sykosky was not a
19  medical professional.  Furthermore, there is no evidence showing
20  that Sykosky should have treated Achen differently on August 5,
21  2000 because of Achen's medical history at MDF, or that Sykosky
22  disregarded requests for heightened correctional supervision.
23  Thus, Sykosky's actions were not unconstitutional.

24      ii.  Sheriff Prieto

25      Plaintiffs argue that Prieto was deliberately indifferent to

26  _____

contacted medical staff to pass along the information.

the inadequate quality of medical services provided at MDF.
Prieto denies being aware of, much less indifferent to, the
allegedly poor medical care at the County facility.  (Johnson
Decl., Ex. 2, at 18.)  Plaintiffs point to complaints lodged by
various County Public Defenders and public boards about MDF's
poor care to show actual knowledge.[25]  However, a number of these
complaints were made in December 2000 – four months after Achen's
suicide.  These letters cannot be used to show that Prieto knew
about and disregarded poor medical care at MDF at the time of
Achen's suicide.  Furthermore, the County's medical care at MDF
has consistently passed audit inspections performed by the Board
of Corrections, the California Medical Association and the Yolo
County Grand Jury.[26]  (Defs.' Mot. at 4.)  Although there may
have been complaints concerning MDF, the record does not support
a finding that Prieto knew and believed that medical care was
constitutionally inadequate at MDF.  The mere existence of
complaints, without more, does not show deliberate indifference
by an administrator such as a sheriff.

iii.  Medical Director Hambly

Hambly argues that he acted reasonably, and that nothing in

[25]  Complaints by various Public Defenders concerning the
medical conditions at the County's facilities are detailed in the
following depositions: Barry Melton (Johnson Decl., Ex. 4),
Charles Bulter (Johnson Decl., Ex. 5), and Robert Spangler
(Johnson Decl., Ex. 6.)

[26]  The Board of Corrections audits review, among other
things, whether County jail facilities comply with training and
staffing requirements as set forth in Cal. Code Regs., Tit. 15, §
100 et seq.  The California Medical Association audits are bi-
annual, and the Yolo County Grand Jury audits are conducted
annually.

14

Achen's medical file signaled to him a need for additional care.
(Hambly Mot. I at 3)   To support this contention, Hambly submits
the affidavit of Dr. Richard Johnson, who gives his opinion that
Hambly's actions met the standard of care for medical doctors.
(Johnson, M.D., Decl. ¶ 11.)[27]  However, plaintiffs provide
evidence to the contrary.  A report completed by one of
plaintiffs' experts, Dr. Terry Allen Kupers, M.D., M.S.P.,
concludes that measures taken by medical staff at MDF "were far
below what is required, the level of care in the community, and
all standards for jail health and mental health care."  (Kupers
Report at 26.)  Achen's file indicated that he had a history of
mental illness and drug addiction, had attempted to commit
suicide two weeks before being detained, was arrested for an
altercation with his girlfriend, had been incarcerated for over a
week without receiving care from a physician or psychiatrist, was
placed on formal suicide watch upon intake, and had not been
receiving prescribed psychotropic medications for a number of
days.  (Pls.' Hambly Opp'n I at 3.)  According to Kupers' report,
"[t]he staff should have evolved a heightened level of suspicion
and concern after the first few [above mentioned] red flags
appeared, and they should have then placed Mr. Achen back on
suicide watch, demanded that a psychiatrist see him on an urgent
basis, and then transferred Mr. Achen to a psychiatric crisis
unit where his medications could be stabilized."  (Kupers Report
at 27.)  There is also evidence that a note addressed to Hambly

_____

[27]  This affidavit is attached to Hambly's first motion for
summary judgment.

had been placed on Achen's medical file urging that Achen receive immediate care from a medical doctor.[28]   (Pls.' Hambly Opp'n I at 1-2.)   In light of factual disputes and the disagreements of the experts, summary judgment is not appropriate.   There is enough evidence in the record to submit the question of Dr. Hambly's alleged deliberate indifference to a jury.

B.   Claims Against Yolo County

    Plaintiffs argue that the County's pattern and practice of insufficient training, staffing, and administrative procedures amounted to deliberate indifference to Achen's medical needs. See Monell v. N.Y. City Dep't. of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037 (1978) (local government liable for constitutional violations committed by employees if a municipal policy or custom was the cause-in-fact of the constitutional deprivation).   The County argues that there is not enough evidence to show a practice of insufficient staffing, training and administration.   (County Defs.' Mot. at 22.)   Furthermore, the County argues that plaintiffs cannot show that these practices caused Achen's suicide.   (Id. at 23.)

    i.   Failure to Train

    Plaintiffs argue that Achen's suicide was caused, in part, by the County's failure to adequately train its corrections officers in suicide prevention.[29]   (Pls.' Opp'n at 21.)

---

    [28]   However, whether this note remained on Achen's file and whether Hambly reviewed this file a second time are in dispute.

    [29]   As an example, plaintiffs argue that corrections officers did not know how to place inmates on formal suicide watch or how to contact the jail psychiatrist.   (Pls.' Opp'n at

Defendants argue that corrections officers were adequately
trained and point to the officers' completion of annual suicide
prevention training.[30]   (Defs.' Mot. at 22.)   A municipality can
be held liable for a failure to train its employees when this
failure amounts to deliberate indifference to the constitutional
rights of its inhabitants.   City of Canton v. Harris, 489 U.S.
378, 388, 109 S.Ct. 1197, 1205 (1989).   However, for liability to
attach, the failure to train "must be closely related to the
ultimate injury."   City of Canton, 489 U.S. at 391.

     MDF corrections officers were trained to recognize strange
or dangerous behavior and communicate this to CFMG staff.
(Defs.' Mot. at 3.)   Plaintiffs have not shown that this training
was inadequate or substandard, nor has it been shown that the
officers failed to act in accordance with this training.   When
Gabriel telephoned MDF to express her concern about Achen's
heightened risk of self-harm, Officer Miller promptly contacted
Nurse Peterson.   (Defs.' Mot. at 6)   After the Davis Police
Department informed County staff of Achen's previous suicide
threat to Hamilton, Schneider promptly contacted Nurse
Christison.   (Defs.' Mot. at 7.)   Both of Achen's pink slips, in
which he expressed concerns about self-harm and requested
medications, were immediately given to CFMG staff.   (Pls.' SDF &
SUF ¶ 28.)   On numerous occasions, officers asked CFMG staff to

21.)

---

     [30]   The County is required to give corrections officers four
hours of training per year on suicide prevention, and CFMG is
required under the terms of its contract with the County to train
officers in suicide prevention.

check on Achen.  On July 30, 2000, Officer Day contacted CFMG staff after Achen told him of his potential for self-harm.  (Id. ¶¶ 29-30.)  There is not sufficient evidence in the record to show that suicide prevention training for corrections officers at MDF was inadequate, much less that inadequate training caused Achen's death.[31]

### ii.  Insufficient Staffing

Plaintiffs argue that MDF had a practice of under-staffing medical personnel at its jails.  (Pls.' Opp'n at 12.)  This under-staffing, plaintiffs argue, resulted in Achen being incarcerated for eleven days without being seen by a medical doctor or psychiatrist.  Furthermore, plaintiffs argue, this under-staffing meant that nurses administered medical care for which they were not trained.  (Pls.' Opp'n at 12; Johnson Decl., Ex. 8, at 3.)  "Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems."  Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1983) (citation and quotation omitted).  Defendants argue that plaintiffs fail to show a pattern of under-staffing at the jail. (Defs.' Mot. at 20.)

Plaintiffs have offered sufficient evidence from which a jury could find that the County had a practice of medical under-staffing.  Several Yolo County Public Defenders and the County's Mental Health Advisory Board expressed concerns about the lack of quality health care at the County's facilities.  (Pls.' SCF ¶¶

---

[31]  The County's liability, if any, for inadequate training of CFMG personnel is not before the court on these motions.

214-217.)  There is evidence that the jail's psychiatrist was only available to see inmates four hours per week and that this limited availability was known to be inadequate.  Dr. Kupers' report states, "[t]he fact that no psychiatrist examined Mr. Achen . . . constitute[s] entirely inadequate mental health care. . . . It is fair to say that the CFMG health and mental health staffing are far less than adequate, and the thinness of the staffing played a significant part in Mr. Achen's demise." (Kupers Report at 17, 23.)  See also Johnson Decl., Ex. 17, at 47; Ex. 21, at 23.  This claim must be resolved by a jury.

### iii.  Informal Suicide Watch

Plaintiffs also argue that the County had a custom of placing inmates on informal suicide watch and had a practice of failing to log interactions with inmates.  Plaintiffs argue that the officers developed a system of informal suicide watch because it required little to no paperwork and did not require officers to contact medical staff.[32]  (Pls.' Opp'n at 18-20.)  Although a practice of informal watch may have developed among officers at MDF, it does not necessarily follow that this practice caused Achen's suicide or enhanced his risk of self-harm.  Corrections officers are not trained medical professionals.  Their primary role in the administration of medical care is to communicate with CFMG staff, who then provide the direct care.  Evidence in the

---

[32]  Plaintiffs argue that formal suicide watch requires more paperwork because the officers must note the watch in their shift log and because medical staff must evaluate the inmate and note that the evaluation took place in the inmate's medical file. (Pls.' Opp'n at 18-20.)

record shows that correctional guards diligently communicated Achen's medical needs to CFMG staff.  There is not a single instance in which a guard put Achen on informal watch rather than contacting a medical professional.  Indeed, the only instance of "informal" watch of Achen occurred after a medical professional decided that formal watch status was not required.  Because Achen's care did not suffer in this respect, the County cannot be liable in this case for a practice of informal watch by correctional officers.  Furthermore, informal watch may encourage more robust guard supervision if officers elect to keep an inmate on informal watch even after medical staff determines that formal suicide watch is unnecessary.[33]

Plaintiffs' argument that Achen's suicide was caused by the guards' failure to log interactions with inmates is not supported by the record.  While plaintiffs argue that guards could have memorialized more of their interactions with Achen, there is no evidence to show that inadequate logging or documentation caused the quality of MDF's medical care to suffer or that it caused or contributed to Achen's suicide.

<u>IV.   State Law Claims</u>

A.  <u>Article I, § 7(a) of the California Constitution</u>

Article I, § 7 of the California Constitution guarantees that "[a] person may not be deprived of life, liberty, or property without due process of law or denied equal protection of

_____

[33]  Because the CFMG defendants have not moved for summary judgment, the question of informal watch as to CFMG staff is not addressed here.

the laws."   In <u>Katzberg v. Regents of the Univ. of Ca.</u>, 29

Cal.4th 300, 317-332, 127 Cal.Rptr.2d 482 (2002), the California

Supreme Court held that article I, § 7 could not be used to

recover damages if other damage remedies are available.   "[W]e

find nothing . . . to suggest that the voters affirmatively

intended to create, with article I, § 7(a), a damages remedy with

respect to the due process clause set forth in this

constitutional provision."   <u>Id.</u> at 320.   Because other avenues

for damage relief are available, article I, § 7 can only be used

to pursue injunctive or declaratory relief.   <u>Id.</u>  Plaintiffs only

seek monetary damages and costs.   Therefore, summary judgment on

plaintiffs' article I, § 7(a) claim is GRANTED.

B.   California Civil Code § 52.1

> Civil Code § 52.1(b) provides a private cause of action when
>
> a person or persons, whether or not acting under the
> color of state law, interferes by threats,
> intimidation, or coercion, or attempts to interfere by
> threats, intimidation, or coercion, with the exercise
> or enjoyment by any individual or individuals of rights
> secured by the Constitution or laws of the United
> States, or of the rights secured by the Constitution or
> laws of this state.   Cal. Civ. Code § 52.1(b).

There is no evidence in the record to suggest that the County

defendants threatened, intimidated, or coerced Achen while he was

incarcerated at MDF.   The County defendants' motion for summary

judgment is GRANTED on plaintiffs' fifth cause of action.[34]

_____

[34]  Because the CFMG defendants and Hambly did not move for
summary judgment on this claim, summary judgment is granted only
as to the County defendants.

21

C.  Wrongful Death (Negligent and Intentional)[35]

Code of Civil Procedure § 377.60 provides:

A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf: (a) The decedent's surviving spouse, children, and issue of deceased children, or, if none, the persons who would be entitled to the property of the decedent by intestate succession.  Cal. Civ. Prac. Code § 377.60.

Triable issues of material fact remain as to whether Hambly neglected Achen's medical needs by failing to take additional steps concerning Achen's medical care after reviewing his file. Summary judgment for defendant Hambly on plaintiffs' wrongful death claim is therefore DENIED.  This claim survives as to the remaining defendants, none of whom has moved for summary judgment on this claim.

D.  Negligent Infliction of Emotional Distress

Deming seeks damages for negligent infliction of emotional distress because she was "in close proximity to. . . and personally heard and witnessed the death of [her brother]." (Comp. ¶¶ 112-13.)  The facts do not support this type of recovery.  A party may recover for negligent infliction of emotional distress as a bystander if she: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event and is then aware it is causing injury to the victim; and (3) suffers emotional distress beyond that anticipated in a disinterested witness.  Thing v. La Chusa, 48

---

[35]  Only defendant Hambly moved for summary judgment on these claims, which are designated in plaintiffs' complaint as claims six and seven.

Cal.3d 644, 667-68 (1989).  Deming has failed to meet the second
requirement of <u>Thing</u>.  It is undisputed that Deming did not see
or hear Achen commit suicide.  (Deming Opp'n at 1.)  She was not
informed of her brother's suicide before she left MDF during her
first visit on August 5, 2000.  (<u>Id.</u>)  She argues that she was
made "aware" of her brother's death because she had received
Achen's letters contemplating self-harm, was told about the
cancellation of MDF visiting hours, and saw the ambulances
outside of MDF.  (<u>Id.</u>)  She argues that, together, these events
gave her a contemporaneous awareness and observation of Achen's
suicide. (<u>Id.</u>)  However, an inference or premonition – regardless
of its accuracy – is not a contemporaneous observation or
awareness under <u>Thing</u>.  <u>See</u> <u>Hulbut v. Sonora Cmty. Hosp.</u>, 207
Cal.App.3d 388, 397, 254 Cal.Rptr. 840 (1989) (rejecting
negligent infliction of emotional distress claim for observance
of injury to child because parents' perception of injury produced
by hospital's negligence could only be characterized as a
"deduction" or "inference"); <u>Ebarb v. Woodbridge Park Ass'n</u>, 164
Cal.App.3d 781, 785, 210 Cal.Rptr. 751 (1985) (rejecting claim
that percipient witness can recover for negligent infliction of
emotional distress so long as she perceived the event "even if by
deduction").  Therefore, summary judgment is GRANTED for
defendant Hambly on plaintiffs eighth cause of action.

E.  <u>Intentional Infliction of Emotional Distress</u>

Defendant Hambly argues that California law restricts
Achen's estate from recovering pain and suffering damages.
(Hambly Mot. II at 4.)  He moves for summary judgment on

plaintiff's ninth claim and seeks to restrict the estate from recovering pain and suffering damages under the remaining federal and state claims. California Code of Civil Procedure § 377.34 ("Section 377.34") prohibits the estate from recovering damages for a decedent's pain and suffering.[36] Therefore, Achen's estate cannot bring a claim for any alleged pain and suffering during his incarceration. (Compl. ¶¶ 114-15.) Summary judgment is GRANTED on this claim. Hambly also seeks to restrict the estate from claiming these damages under the remaining state law claims.[37] For the reasons explained above, this request is also GRANTED.

Whether pain and suffering damages are foreclosed under plaintiffs' § 1983 claims is a more difficult question. See Smith v. City of Fontana, 818 F.2d 1411, 1417 n.7 (9th Cir. 1987) (acknowledging but refusing to express an opinion on the issue). In a previous case, the court found that Section 377.34 is not inconsistent with the Constitution and laws of the United States, and therefore no pain and suffering damages are available under § 1983 for survivors. See Venerable v. City of Sacramento, 185

---

[36] The statute provides: "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." See, County of Los Angeles v. Superior Court, 21 Cal.4th 292, 306, 87 Cal.Rptr.2d 441 (1999) (explaining California's survival statute).

[37] The two remaining state law claims are for wrongful death (claims six and seven).

F.Supp.2d 1128, 1133 (E.D.Cal. 2002).  Accordingly, Achen's estate cannot recover pain and suffering damages under the federal claims.

V.  Conclusion

Summary judgment is GRANTED on plaintiffs' first claim (Fourteenth Amendment violation) as to defendants Prieto, Miller and Sykosky.  Summary judgment is DENIED as to defendant Hambly.

Summary judgment is GRANTED as to defendants Prieto, Miller and Sykosky on plaintiffs' second claim (failure to train and to supervise).

Summary judgment is GRANTED as to the County defendants on plaintiffs' third claim (deliberate indifference to poor medical care).  Summary judgment is DENIED as to defendant Hambly.

Summary judgment is GRANTED on plaintiffs' fourth claim (Article I, § 7(a) of the California Constitution).

Summary judgment is GRANTED on plaintiffs' fifth claim as to the County defendants (Civil Code § 52.1(b)).

Summary judgment on the wrongful death claims (sixth and seventh causes of action (consolidated) is DENIED.

///

///

///

///

///

///

///

1    Summary judgment is GRANTED on plaintiffs' eighth claim

2  (negligent infliction of emotional distress).

3    Summary judgment is GRANTED on plaintiffs' ninth claim

4  (intentional infliction of emotional distress).

5    IT IS SO ORDERED.

6  Dated: 31 March 2004.

7

8                          DAVID F. LEVI
                           United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

United States District Court
for the
Eastern District of California
March 31, 2004

* * CERTIFICATE OF SERVICE * *

2:01-cv-01478

Falkenburg

v.

County of Yolo

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on March 31, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

    Justin Matthew Gingery                HV/DFL
    Gingery Thompson and Derdowski
    4811 Chippendale Drive
    Suite 503
    Sacramento, CA  95841

    Douglas L Johnson
    Johnson and Rishwain LLP
    12121 Wilshire Boulevard
    Suite 1201
    Los Angeles, CA  90025

    Bruce Alan Kilday
    Angelo Kilday and Kilduff
    601 University Avenue
    Suite 150
    Sacramento, CA  95825

    Jerome M Varanini
    Trimble Sherinian and Varanini
    2500 Venture Oaks Way
    Suite 350
    Sacramento, CA  95833-0590

    Peter George Bertling
    Bertling and Clausen

15 West Carrillo Street
Suite 100
Santa Barbara, CA  93101

Jack L. Wagner, Clerk

BY: _____
    Deputy Clerk